# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MBM HOLDINGS LLC and BRET EULBERG,

    Plaintiffs,

v.

CITY OF GLENDALE WISCONSIN and COLLIN JOHNSON,

    Defendants.

Case No. 19-CV-366-JPS

**ORDER**

**1.    INTRODUCTION**

Plaintiffs, property owners in the City of Glendale (the "City"), complain that Defendants, the City and its former building inspector Collin Johnson ("Johnson"), improperly issued a raze order for their property in violation of their rights under the Constitution and state law. (Docket #1). Defendants have filed a motion for summary judgment, (Docket #16), and that motion is fully briefed, (Response, Docket #24; Reply, Docket #25). For the reasons explained below, the motion will be granted, and this action dismissed.

**2.    STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 ("FRCP") provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3. **RELEVANT FACTS**

Plaintiff Bret Eulberg ("Eulberg") is the sole member of MBM Holdings LLC ("MBM"), which in turn purchased an all but abandoned commercial building located at 1811 West Silver Spring Drive, within the City limits (the "Silver Spring" property). Eulberg is a jeweler by trade and had no expertise in construction related matters. He has no formal training in architecture, engineering, or electrical, plumbing, or HVAC trades. Johnson was employed by the City as the Director of Inspection Services and Flood Plain Administrator from May 2005 until May 2018. In that capacity, Johnson was responsible for enforcing building codes. An aside about Johnson. In September 2016, the City offered him a separation agreement, as certain City officials were unhappy with Johnson's strict enforcement of building codes. Johnson declined the agreement. The City did not place any restrictions on Johnson's terms of employment at that juncture.

MBM purchased the Silver Spring property in September 2015. Eulberg only entered the building once before buying it, and did not have it professionally inspected, because it was so inexpensive that he felt he could absorb any repair costs. He also assumed that the building was up to code, though he made no effort to confirm that assumption. Eulberg was at least aware that the building had broken pipes and needed roof repairs.

In May 2017, Eulberg leased the building to Charese Gardner ("Gardner") at a below-market discounted rate. The discount was intended to provide Gardner ample funds to make needed repairs. The property was leased as-is, and Eulberg left Gardner to her own devices. At the same time Eulberg was unmindful of the fact that he needed an occupancy permit to occupy the building and was not aware that the Silver Spring occupancy was illegal. He also did not concern himself with any repairs or improvements to the building until January 2019. At that time, he and Gardner revised the lease terms which, as amended, required Gardner to make roof repairs in order to ensure that the building would comply with City occupancy permit requirements.

Johnson drove past the Silver Spring property daily as part of his work for the City. In May 2017, he went in the property to check on a water meter break. Johnson took pictures of damaged pipes as it appeared to him that an unlicensed plumber had attempted to make repairs. In July 2017, Johnson noticed woodworking activity at the property, which required particular permits that had not been issued. Johnson met with Gardner and did an inspection of the building. Afterwards, Johnson e-mailed Gardner and Eulberg, informing them that the building was not habitable because of issues with plumbing, electricity and heating together with structural concerns with the roof, as well as mold.

Johnson also requested another walkthrough of the building which would include the fire department. Eulberg left the matter to Gardner to deal with, as in his mind, it was effectively her building. Indeed, Eulberg was miffed by Johnson's email because he felt the issues that were identified were present prior to him purchasing the property. The only issue he definitively objected to, however, was the alleged electrical problem, namely wires dangling from the ceiling. Eulberg testified that he believed those wires were internet cables, not electrical, based on his prior experience with internet network installations.

On August 22, 2017, Johnson, the fire department, and Gardner conducted another inspection of the property. Eulberg chose not to attend, again citing his belief that it was Gardner's problem, not his. Johnson took pictures of the building during the inspection. The pictures of the outside showed a dilapidated building which included some graffiti. The interior photos revealed allegedly illegal wiring (which, as noted above, Eulberg disputes) and structural issues. The interior also contained combustible materials installed by the previous owner which were not code compliant. Finally, the photos noted examples of water damage in the form of leaks, mold, rot, and damage to the electrical panel.

The fire department, for its part, had concerns with ingress and egress from the building. The fire marshal told Eulberg that he would not send firefighters into the building if it caught fire because of those concerns. Johnson also documented signs of illegal occupancy, which included indications that a business would open up there soon. Overall, Johnson discovered substantial electrical, plumbing, heating, structural, occupancy, and health concerns with the property. Johnson testified that all of these issues would have been apparent to any inspector had Eulberg obtained an

independent inspection before completing purchase of the property in question.

At the time of the inspection, the Silver Spring building, excluding the land, was assessed at $260,400. Wisconsin law provides that if a building needs repairs costing more than fifty percent of its assessed value, it is a candidate for razing. Johnson concluded that the total cost of repairs would have exceeded half the building's value. On August 25, 2017, Gardner met with City officials to discuss their concerns with the property and was informed that the building may be subject to a raze order. Eulberg declined to attend that meeting.

On October 20, 2017, Johnson drafted a notice of condemnation and raze order for the Silver Spring property (the "Raze Order"), which was sent to Eulberg through the City attorney's office. The Raze Order stated that the building was dangerous, uninhabitable, and unreasonable to repair, and outlined all of the problems that were discovered in the inspections. The Raze Order instructed that all current occupancy of the building must cease immediately, and warned that any renting, leasing, or occupation of the building may result in fines. Finally, the Raze Order demanded that Eulberg either raze or repair the building within ninety days.

When he received the Raze Order, Eulberg did two things. First, he contacted his alderman and friend, who, at the time also served as the City Chamber of Commerce president, to complain about the Raze Order. Second, Eulberg also told Gardner that she needed to fix the building. He did not make any repairs himself or ask Gardner whether she was doing so. Eulberg's position remained that it was Gardner's responsibility.

In December 2017, Eulberg, Gardner, Schmidt, and another City official met to discuss resolution of the Raze Order. Later that month, Johnson sent Eulberg a letter stating that the City would rescind the order if certain conditions were met. These included paying for permits for roof and plumbing work that had already been done as well as the necessity of obtaining professional inspections to determine the scope of work necessary to bring the remaining deficiencies up to code. Plaintiffs suggest that Johnson's letter was evidence that the City was retreating from the allegations in the Raze Order, while Defendants maintain that it was merely an effort to come to an agreeable resolution of the situation. The letter instructed Eulberg to respond by January 19, 2018.

On January 11, 2018, a residential home inspector, not a commercial building inspector, performed an inspection of the Silver Spring property. Over three months later, in April 2018, the inspector's report and a repair assessment were provided to the City. The inspector concluded that the building was not in such poor shape that it needed to be razed and estimated that it would cost just under $10,000 to make essential repairs. Based on these documents, the City determined that Eulberg had complied with the terms of the December 2017 letter. Johnson sent Eulberg a letter in May 2018 stating that the raze provision of the Raze Order was rescinded, but that Eulberg still needed to complete the necessary repairs to obtain an occupancy permit.

Johnson was not happy about sending the May 2018 letter. Indeed, he was ordered to do so by City Administrator Rachel Safstrom ("Safstrom"). She also imposed conditions on his employment with respect to communicating with building owners and providing support for the code violations he claimed to have witnessed. Johnson was soon after

terminated for insubordination. Safstrom testified that Johnson was not fired for his enforcement of building codes or lack of expertise in that area. Johnson's termination was effective at the end of May 2018. The Silver Spring property continued to have maintenance issues after Johnson's termination, including sloppy lawn maintenance, a substantial unpaid water bill, and a "soil mitigation system" that Eulberg had installed, but claims that the City is now responsible for.

4. **ANALYSIS**

Plaintiff's complaint purports to present six causes of action; however, upon closer inspection, this is incorrect. The first two enumerated claims are made pursuant to 42 U.S.C. § 1983. (Docket #1-2 at 7–8). The first is titled "Failure to Intervene." *Id.* at 7. One paragraph of the claim alleges that the City negligently failed to intervene to stop Johnson's conduct. *Id.* at 7 ¶ 21. This "claim" makes no sense, as a municipality can only be liable for its policies or pattern of practices pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978), discussed further below. Additionally, it is unclear what constitutional provision required the City's intervention.

The next paragraph states that "defendants" denied Plaintiffs equal protection as guaranteed by the Fourteenth Amendment by discriminating against them, though the basis for the discrimination is not stated. (Docket #1-2 at 7 ¶ 22). Instead, the Court finds that it would have been more appropriate to consider it a stand-alone claim that should have been separately titled. More to the point, no matter how pled or titled, this claim cannot be raised against the City without an allegation of improper policies or practices.

The next Section 1983 claim is titled "Policies and Practices," and is apparently Plaintiffs' bid for *Monell* liability. *Id.* at 8. Therein, Plaintiffs maintain that Johnson's conduct, and that of the other City employees in this case, was "done pursuant to one or more policies, practices[,] or customs of the [City] to fail to properly hire, train, supervise, discipline, monitor, counsel, reassign and otherwise control the acts of building inspectors, particularly those involving situations and regarding whom complaints have been made." *Id.* This sweeping allegation is not aimed at either defendant, but the target must be the City, as Johnson is an individual person, and his "policies and practices" are immaterial as distinct from his actual conduct.

Plaintiff's final four claims are made pursuant to state law. One attempts to allege negligence, though curiously, it does not actually make such allegations, and does not identify which defendant(s) were negligent. *Id.* at 8–9. The next alleges that Johnson is liable for intentional infliction of emotional distress. *Id.* at 9. The final two "claims" are for *respondeat superior* and indemnification, though neither is actually a cause of action. *Id.* at 9–10.

The foregoing demonstrates that Plaintiffs' pleadings are far from a model of clarity and should have been the subject of a motion to dismiss or for a more definite statement. Unfortunately, Defendants did not file such a motion, and confusion over the true nature of Plaintiffs' claims is apparent not only in Defendants' brief, but in Plaintiffs' submissions as well. The Court is compelled to rely on Plaintiffs' arguments in their response brief as the most authoritative statement of what claims they actually advance in this case.

This is not ideal either. The brief is short, heavy on conclusory, underdeveloped, and ill-formed arguments, that at bottom proved to be of little help to the Court's legal analysis. From the brief, the Court distills Plaintiffs' claims to be the following: 1) a violation of the right to equal protection of law; 2) a violation of the right to due process; and 3) the state law claims identified in the complaint. The Court will address the due process claim first, then equal protection, and finally the state law claims.[1]

### 4.1 Due Process

The reader, and the Court for that matter, may be confused by a discussion of due process here. The complaint contains not a whisper of allegations that Defendants' conduct denied Plaintiffs due process of law. *See generally* (Docket #1-2). Instead, the second claim in the complaint is leveled at the City's "Policies and Practices" with respect to oversight, or lack thereof, for "building inspectors, particularly those involving situations and regarding whom complaints have been made." *Id.* at 7. As the Court commented above, the claim is worded quite broadly, but is not actually founded on any constitutional violation; a municipality's failure to properly oversee an employee, standing alone, does not offend the

---

[1]Plaintiffs' submission is so poor that the Court is left to consider finding all of their arguments underdeveloped and thus waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). The Court's displeasure is not limited to Plaintiffs' brief. Defendants' filings are also confused and imprecise. Perhaps some of this could be due to the quality of Plaintiffs' complaint and brief, but that provides no excuse. If counsel for the parties expect to continue to enjoy the right to practice before this branch of the court, they have an obligation to take much greater care to present their arguments clearly and thoroughly, particularly when addressing complex issues which involve constitutional law and *Monell* liability. Ultimately, if the Court's understanding of Plaintiffs' claims, and/or the parties' arguments generally, is in error, counsel have only themselves to blame.

Constitution. Plaintiffs' brief reveals that this claim is grounded in the Due Process Clause of the Fourteenth Amendment. *See* (Docket #24 at 8–13).

Plaintiffs vaguely suggest that they proceed on both procedural and substantive due process claims. The Court will analyze both. A procedural due process claim has two elements. First, Plaintiffs must show that they were deprived of a protected liberty or property interest. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Second, they must demonstrate that there were "insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008). The scope of substantive due process protections is extremely limited. *Lee v. City of Chi.*, 330 F.3d 456, 467 (7th Cir. 2003). "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest[.]" *Id.* "And when a substantive-due-process challenge involves only the deprivation of a property interest, a plaintiff must show either the inadequacy of state law remedies or an independent constitutional violation before the court will even engage in this deferential rational-basis review." *Id.* (quotation omitted).

Unsurprisingly, Plaintiffs are also unclear as to whether their due process claims target Johnson, the City, or both. The Court will assume the latter. It appears that Defendants concede that the Raze Order constitutes a deprivation of a property interest. (Docket #17 at 13). The Court is not so sure, but even if that were true, the existence of available state remedies defeats both a procedural and substantive due process claim. The Raze Order plainly states that there are established procedures for challenging the order in state court. (Docket #19-16 at 2). Plaintiffs don't go so far as to even suggest that these procedures were inadequate, much less persuade

the Court of that fact. Plaintiffs have therefore failed to demonstrate that any alleged deprivation was accompanied by inadequate state procedures to address and, if necessary, correct the deprivation. The Court thus need not engage in a rational basis analysis, *Lee*, 330 F.3d at 467, but it would find Johnson's conduct rational in any event, *see infra* Part 4.2.

These findings preclude a due process claim against Johnson. But as it appears that Plaintiffs' primary target for their due process concerns is the City, the Court notes additional reasons why the claim would fail against the City. Local government entities, such as municipalities and counties, cannot be held vicariously liable for constitutional violations committed by their employees. *Monell*, 436 U.S. at 690. Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). Plaintiffs must also demonstrate "the requisite causation," which means that "the policy or custom was the 'moving force' behind [his] constitutional deprivation." *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002). These are colloquially referred to as "*Monell*" claims.

Plaintiffs focus on the second species of *Monell* claim, arguing that the City had an unofficial policy of lax control over Johnson despite knowing that he was a stern enforcer of building codes. This theory is not viable for two reasons. First, a *Monell* claim cannot proceed without an underlying constitutional violation. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504–05 (7th Cir. 2010). The Court has already concluded that

Johnson did not violate Plaintiffs' due process rights. Second, Plaintiffs lack critical evidence for their unofficial policy theory. The policy in question must be a persistent and widespread practice, meaning that the harmful conduct must have occurred at least a few times previously to give policymakers adequate notice and an opportunity to address the issue. *Thomas*, 604 F.3d at 303. Plaintiffs' evidence relates only to their own experience, however. They make no effort to demonstrate that Johnson had issued improvident raze orders to any other property owners, thereby giving the City notice of a problem.²

The Court will address a few remaining issues attendant to this discussion. First, as noted above, there can be no "failure to supervise" liability independent of some constitutional violation. To the extent Plaintiffs believed otherwise, they are incorrect. Second, in one sentence in the section of their brief discussing the due process claim, Plaintiffs make an off-hand reference to Johnson's alleged violation of their rights under the Contracts Clause. (Docket #24 at 9). While the Court has generously construed a due process claim into this case, it will not do the same for an unpleaded and undeveloped Contracts Clause claim. Further, the Contracts Clause has no bearing on this case, as Plaintiffs' alleged injuries do not arise from a legislative enactment. *See Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 822 (7th Cir. 2019).

---

²Plaintiffs anemic suggestion that Johnson may qualify as a final policymaker for the City is simply unfounded. *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674–76 (7th Cir. 2009). Rather, Safstrom was the relevant policymaker. Regardless, the Court has found no constitutional violations which Safstrom could have directly caused or otherwise ratified.

### 4.2 Equal Protection

The Equal Protection Clause of the Fourteenth Amendment is generally aimed at guarding against government discrimination on the basis of membership in a protected class of persons, such as race, national origin, and sex. *Geinosky v. City of Chi.*, 675 F.3d 743, 747 (7th Cir. 2012). Equal protection rights can also extend to individuals, regardless of class association, if they are singled-out for different treatment for arbitrary or irrational reasons. *Id.* These are known as "class-of-one" claims, and to prove one, a plaintiff must establish that they "had been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quotation omitted).

Plaintiffs maintain that issuance of the Raze Order was irrational. As explained above, the Raze Order could only be issued if the property needed well over $100,000 in repairs, but Plaintiffs' contractor concluded that only about $10,000 was needed to preserve the building. Plaintiffs are also concerned that Johnson never prepared a field report or told them about any code violations prior to issuing the Raze Order.

This argument fails for two reasons. First, Plaintiffs do not even attempt to point to others who were similarly situated who were treated differently. The foundation of an equal protection claim is a demonstration of dissimilar treatment of similar people without good reason. Without comparators, Plaintiffs have no ability to demonstrate that they were treated differently than anyone else, whether for good and sufficient reasons or otherwise. Second, Plaintiffs' disagreement with Johnson's assessment does not make Johnson's conduct entirely irrational. Instead, the disagreement is just that—a difference of opinion. Johnson gathered his

evidence via multiple inspections and decided that the building was an appropriate candidate to be razed. That Plaintiffs' home inspector came to a different conclusion is not evidence that Johnson's view was baseless.

Plaintiffs do not allege that Johnson acted with any personal animosity toward them. They merely complain that his decision to issue the Raze Order was erroneous. The Supreme Court's opinion in *Engquist* provides an apt analogy to Plaintiffs' case:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.
>
> Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not

> others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

*Engquist*, 553 U.S. at 603-04. Here, Plaintiffs are like the hypothetical speeder who was stopped and ticketed. Johnson exercised wide discretion in carrying out his duties, and in this instance he did so to Plaintiffs' detriment. Without comparators, Plaintiffs have not shown that other property owners were treated differently. Ultimately, Plaintiffs' complaint is not with unconstitutional discrimination, but rather merely a "challenge[] [to] the legitimacy of the underlying action itself." *Id.* The Equal Protection clause is unconcerned with disputes of this nature.

The Court concludes with an observation about the parties' other equal protection arguments. First, one might reasonably conclude, despite the structure of their brief, that Plaintiffs intended to pursue a *Monell* claim against the City on their equal protection allegations. The Court finds this would fail for the same reasons as with the due process claim. There is no underlying equal protection violation to support *Monell* liability, and Plaintiffs have not shown that there was a known defect in the procedural protections surrounding raze orders that the City should have known about and corrected. Second, Defendants' briefs suggest that Safstrom or other City officials have some duty to respond to the equal protection claim. Plaintiffs have not sued anyone other than Johnson and the City, so the other City officials have no obligation to mount a defense. Constitutional liability is personal to an individual or entity; it does not flow automatically from one to the other, regardless of their affiliation. *See Gaston v. Ghosh*, 920

F.3d 493, 494 (7th Cir. 2019); *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017).

## 4.3 State Law Claims

Plaintiffs make no attempt to defend their claim for intentional infliction of emotional distress or their "claim" for respondeat superior. Those claims will be dismissed as abandoned. The indemnification claim will be dismissed as unnecessary. As noted above, it is not a cause of action at all. It is simply a means by which Plaintiffs can collect money from the City for damages awarded against Johnson. This would only mature into a dispute if Defendants argued that Johnson was acting outside the scope of his employment for his damage-inducing conduct. *See Martin v. Milwaukee Cty.*, 904 F.3d 544, 551–54 (7th Cir. 2018). Defendants have not advanced such an argument. *See* (Docket #17 at 19–22).

Only the negligence claim remains. Defendants contend that Wisconsin law immunizes their conduct from claims for damages. Specifically, Wis. Stat. § 893.80(4) provides that suits may not be brought against municipalities or their employees "for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wisconsin courts have concluded that such functions are more simply and broadly described as discretionary, as opposed to being ministerial. *Legue v. City of Racine*, 849 N.W.2d 837, 849 (Wis. 2014); *Lodl v. Progressive N. Ins. Co.*, 646 N.W.2d 314, 335 (Wis. 2002). An act is ministerial, and thus not entitled to immunity, "only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance." *Lister v. Bd. of Regents of Univ. Wis. Sys.*, 240 N.W.2d 610, 622 (Wis. 1976).

Defendants maintain that Johnson's actions were discretionary. Interestingly, Plaintiffs agree. In their three-sentence response to Defendants' immunity argument, Plaintiffs say that "the acts of [Johnson] and the City are not ministerial as there was no rational basis for the raze order." (Docket #24 at 15). While the second portion of the sentence makes little sense in this context, the Court must take Plaintiffs at their word as to the first portion. Because Johnson's conduct was discretionary, both he and the City are entitled to immunity from Plaintiffs' negligence claim.

5. **CONCLUSION**

The overarching theme of Plaintiffs' case is displeasure with Johnson's decisions and the City's oversight thereof, but disagreement with governmental action is not the same as a violation of one's constitutional rights. Instead, Plaintiffs' claims are akin to political questions—in what manner should building codes be enforced? The Constitution does not exist to address these concerns. The state law claims might be a more appropriate vehicle for redress, but Plaintiffs either waived them or conceded that they should be dismissed. The Court will, therefore, grant Defendants' motion for summary judgment and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #16) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of January, 2020.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge